FILED

APR 0 6 2017

Clerk, U. S. District Court
Eastern District of Tennessee
At Greeneville

No. 2:17-mj-64

**UNITED STATES DISTRICT COURT**
**FOR THE**
**EASTERN DISTRICT OF TENNESSEE**

In the Matter of the Search of
**Eduardo CALLEJAS-ROMERO/AKA: Lola BORJA Residence:**
**2685 Helton Gaby Rd, Morristown, Tennessee 37814 (SUBJECT PREMISES)**
**2007 Ford Fusion: VIN: 3FAHP07147R150934 (SUBJECT VEHICLE 1)**
**2004 Jeep Liberty: VIN: IJ4GL48K64W181170 (SUBJECT VEHICLE 2)**

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Special Agent Travis Carrier, being duly sworn, depose and state the following:

**I. INTRODUCTION**

1. I am a Special Agent with the U.S. Department of Homeland Security (DHS),
Homeland Security Investigations (HSI), currently assigned to the Office of the Special Agent in
Charge, New Orleans, and stationed at the Resident Agent in Charge, Knoxville, Tennessee
Office. I have been employed as a federal law enforcement agent since February, 2005. I am
responsible for conducting federal investigations relating to crimes involving aggravated identity
theft, manufacturing and distribution of fraudulent government identification documents and the
misuse of a United States issued Social Security card. I am a graduate of the Federal Law
Enforcement Training Center's Criminal Investigator Training Program and have received basic,
advanced, and on-the-job training in the investigation of cases involving aggravated identity theft
and the misuse of a Social Security card. As a federal agent, I am authorized to investigate
violations of the laws of the United States and to execute warrants issued under the authority of
the United States. The facts in this affidavit come from information obtained in the course of an
ongoing investigation.

2. This investigation concerns alleged violations of Title 18 U.S.C. 1028A, Aggravated
Identity Theft: In general, whoever, during and in relation to any felony violation enumerated in

1

subsection (C), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of two years; Title 42 U.S.C. 408(a)(7)(C)(8), Misuse of Social Security Card: Whoever knowingly alters a Social Security card issued by the Commissioner of Social Security, buys or sells a card that is, or purports to be, a card so issued, counterfeits a Social Security card, or possesses a Social Security card or counterfeit Social Security card with the intent to sell or alter it; or discloses, uses, or compels the disclosure of the Social Security number of any person in violation of the laws of the United States; Title 18 U.S.C. 1028 (7), Identity Theft: Whoever knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or aid or abet, or in connection with, any unlawful activity that constitutes a violation of federal law, or that constitutes a felony under any applicable state or local law; Title 18, United States Code, Section 1028 (a) (4), Identity Theft: Whoever knowingly possesses an identification document (other than the one issued lawfully for the use of the possessor), authentication feature, or a false identification document, with the intent such document or feature be used to defraud the United States; and Title 18, United States Code, Section 922(g)(5): Being an illegal alien in possession of a firearm.

## II. BACKGROUND INFORMATION ON PROCEDURES FOR OBTAINING A SOCIAL SECURITY CARD

3. Based upon my conversation with other agents with training and experience in the issuance of Social Security cards, I know that the legal procedures for obtaining a Social Security card are as follows:

    **a.** Service Representatives employed by the Social Security Administration are responsible for interviewing applicants for Social Security numbers ("SSNs"), checking the

2

applicants' identity documents, determining eligibility for a SSN, and issuing Social Security cards;

**b**. All individual applicants for a SSN must complete a form known as a SS-5, Application for a Social Security number. Non-citizens of the U.S. must go in person to a SSA office to apply, and must provide the United States Citizenship & Immigration Services (USCIS) documentation establishing lawful residence and proof of identity. This information is provided to the SSA employee by the applicant and is recorded on the application form;

**c**. In the case of non-citizens, a SSA Service Representative must verify the A-numbers of all USCIS documentation provided as proof of lawful residence in the U.S. The verification is done by querying the alien registration number ("A-number") in the Central Index System database, which is accessible through the computer terminal of the SSA employee;

**d**. After the USCIS information is verified, the application is then entered into the SSA database and a SSN is generated. The Social Security card is then automatically mailed from Baltimore, Maryland, to the mailing address provided by the applicant. The applicants' personal identifying information is maintained within the Social Security database.

### III. <u>FACTS ESTABLISHING PROBABLE CAUSE</u>

4. On September 29, 2016, HIS working with the Morristown Police Department (MPD) utilized a MPD Confidential Informant, (herein referred to as the CI) in an effort to further an investigation into fraudulent identity documents being manufactured and sold in Hamblen County, Tennessee. At the direction of law enforcement, the CI met with an Hispanic male previously identified and referred to as Lola BORJA, and now known and identified as Eduardo Callejas-Romero and (herein referred to as ROMERO). See paragraph 16 for full identification of ROMERO. The said meeting was for the purpose of purchasing fraudulent documents, including a driver's license and a Social Security card. At approximately 1600 hours, agents/officers provided

3

the CI with a photo, name, and date of birth (DOB) for a fictitious Hispanic male and $160.00 for

the CI to provide to ROMERO to use in the manufacture of the identification documents. The

following outlines what took place during that meeting:

    **a.** At approximately 1613 hours, CI left to meet ROMERO at 305 Inman Street,

        Morristown, Tennessee (Mount View Baptist Church).

    **b.** At approximately 1620 Hours, CI arrived at said church parking lot, spoke with

        an unidentified Hispanic male and walked from church parking lot to the house

        (306 Inman Street) located directly across from the church.

    **c.** Agents later learned that the unidentified Hispanic male advised the CI that

        ROMERO was at the house directly in front of the church. ROMERO's

        vehicle, a black 4 door Ford, plate R7942G (herein referred to as SUBJECT

        VEHICLE 1) was in the church parking lot. At 1740 hours, ROMERO drove

        off in SUBJECT VEHICLE 1.

    **d.** At approximately 1741 hours, the CI walked to his/her vehicle and drove to a

        predetermined location to meet agents/officers.

    **e.** At approximately 1745 hours, The CI stated the following: ROMERO told me

        the said photo I provided him for the documents would not work. ROMERO

        advised he needed the photo to be sent to him from a phone electronically, so

        he could manipulate the photo when making the driver's license. I provided

        ROMERO $60.00 up front for the documents and will pay the remaining

        $100.00 when ROMERO delivers the documents the following day

5. On September 30, 2016, at approximately1530 hours, MPD and Tennessee Highway

Patrol (THP) Identity Theft Crimes Unit Agents again utilized the CI to complete the transaction.

4

Agents met with the CI in a predetermined location and provide the CI further instructions regarding completing the purchase of the previous requested driver's license and Social Security Card from ROMERO. The following outlines what took place during that meeting:

    a. The CI was provided with an audio and visual recording device.

    b. ROMERO called the CI at 1620 hours and advised the CI he would be at Mount View Church at 1630 hours.

    c. Agents set up in the area of 305 Inman Street, Morristown, Tennessee (Mount View Church) to cover the buy.

    d. ROMERO arrived in SUBJECT VEHICLE 1, exited the vehicle and walked up to the CI's vehicle passenger door. Shortly afterwards, ROMERO walked back to SUBJECT VEHICLE 1 and drove away from the area.

    e. The CI returned to a predetermined location and turned over the documents, a North Carolina identification Card # 267228464 and a Social Security card bearing the number XXX-XX-5821. Both documents had the name Carlos Mendieta Reyes affixed.

    f. The CI stated the following regarding his/her transaction with ROMERO: I received a text from a third party advising me to meet MORORA (an alias for ROMERO, and the name Morristown Police Department listed his last name in their reports for this transaction) at Mount View Church. CI stated he/she went to the church and met ROMERO who got out of SUBJECT VEHICLE 1, came over to my vehicle, opened the passenger side door and handed me a Social Security card and a North Carolina ID card with the name Carlos Mendieta Reyes on it. I handed ROMERO, $100.00.

6.  On November 3, 2016, SA Carrier sent a request to the Social Security Office of Inspector General (herein referred to as SSOIG) to verify the Social Security card number XXX-XX-5821 purchased by the CI from ROMERO on September 30, 2016.

   a.  SSOIG SA Thomas Goldman responded advising: SSN ending in 5821 is a valid SSN of a living person, not named Carlos M. Reyes.

   b.  The name Carlos M. Reyes is the name ROMERO placed on the Social Security card along with the authentic U.S. Social Security card number he sold to the CI on September 30, 2016.

7.  On November 15, 2016, agents/officers from the following: HSI, Morristown Police Department (MPD), Tennessee Highway Patrol Investigations (THPI) and U.S. Secret Service (USSS) met with said CI for the purpose of ordering (1) Social Security card and (1) Tennessee driver's license from a ROMERO. The following outlines what took place during that meeting controlled event:

   a.  At approximately 10:07 am, at the direction of agents, CI placed a call to ROMERO at (423) 736-4679. ROMERO answered, and the conversation was in Spanish. CI told officers the following regarding the conversation with ROMERO:   Initially, ROMERO did not know who I was. Eventually, ROMERO recalled who I was. I asked ROMERO about purchasing documents, (1) Social Security card, and (1) Tennessee ID. ROMERO advised he would call me back at approximately 10:16 a.m., ROMERO called the CI back from the same number (423) 736-4679. The CI answered and their conversation was in Spanish.

6

**b.** CI advised ROMERO told him/her he would make the documents, but it would have to be around 1:00 p.m. on the same day.

**c.** At approximately 10:18 am, the CI texted photos of an Hispanic male to ROMERO at (423) 736-4679.

**d.** At approximately 10:27 am, CI placed a call to ROMERO at (423) 736-4679 asking ROMERO if he received the photos. ROMERO advised no.[1] CI told ROMERO he/she could not meet at 1:00 p.m due to work obligations. CI told ROMERO he/she would meet him at 4:30 this date to pick up the documents.

**e.** At approximately 3:30 p.m., CI returned to a predetermined location to meet with agents to conduct the operation.

**f.** At approximately 4:08 p.m., CI called ROMERO at (423) 736-4679. ROMERO told the CI to meet him at 4:30 p.m. at El Pisa on South Cumberland Ave. in Morristown. Agents/officers then dispatched to that area to establish visual contact on the meet location.

**g.** At approximately 4:22 p.m., CI drove to meet ROMERO. Agents/officers followed CI to the meet.

**h.** At approximately 4:28 p.m., CI was observed driving into a parking lot beside of a building adjacent to the Sonic Drive-In located at 1153 South Cumberland Ave, Morristown, Tennessee. ROMERO was observed standing in the said

---

[1] CI called SA Carrier advising ROMERO advised him/her he never received the images on his phone. Earlier in the day, SA carrier, at the CI's request, texted the same photos to the CI and to another phone the CI had at his/her disposal. The photos were then resent in attempt to get the photos to ROMERO. ROMERO and the CI decided to pass the photos in person at the 4:30 meeting this date. ROMERO advised CI the documents would not be ready until the next day. CI refers to ROMERO as BORJA as is listed previously as an alias.

7

parking lot next to SUBJECT VEHICLE 1, which was the only other car in the lot.

i. At approximately 4:40 p.m., the meeting between the CI and ROMERO concluded. ROMERO was observed getting into SUBJECT VEHICLE 1 and driving away.

j. At approximately 5:01 p.m., MPD Detective Rick Harmon observed SUBJECT VEHICLE 1 pull into 2685 Helton Gaby RD, Morristown, Tennessee. Detective Harmon advised that a Hispanic male meeting ROMERO's description entered the residence carrying a white plastic bag.

k. At approximately 5:08 p.m., the CI met with agents/officers at a predetermined location to provide a debrief.

l. CI stated the following in regards to his/her meeting with ROMERO: I met with ROMERO in a parking lot near Sonic. We stood outside our vehicles and spoke for a few minutes. ROMERO and I got into my vehicle where I showed ROMERO the photos on my phone. I explained the issues I had trying to send the photos to him. ROMERO told me how to download an application on my phone that would allow the photos to be sent easily. ROMERO advised to download the application WhatsApp and send the photos to him later.

m. SA Carrier advised CI to call once confirmation was made that ROMERO received the photos and a time to pick up the documents the next day was established.

n. At approximately 6:18 p.m., the CI advised SA Carrier that ROMERO had received the photos.

8

o.  At approximately 9:49 p.m., CI advised SA carrier the meeting was scheduled for 4:30 p.m. the following day to pick up the documents ordered from ROMERO.

8. On November 16, 2016, at approximately 4:20 p.m. and at the direction of SA Carrier, CI placed a call to ROMERO at (423) 736-4679 to obtain a meet location from ROMERO. The conversation was in Spanish.

a.  CI advised that ROMERO told him/her to meet at SunTrust Bank on Main Street at 4:40 p.m. to pick up the documents. Immediately after concluding the call, surveillance equipment the CI had been provided was activated and the CI drove to meet with ROMERO.  Agents/officers were dispatched in the area of the meet location to get eyes on the meeting.

b.  While in route to meet ROMERO, the CI received a call from ROMERO advising the CI to meet at Wal-Greens on South Cumberland Street, Morristown, Tennessee.  Agents/Officers moved to the new location to establish visual contact of the meeting.

c.  At approximately 4:40 p.m., SUBJECT VEHICLE 1 was observed on the east side of Wal-Greens facing South Cumberland Street, Morristown, Tennessee. ROMERO was observed outside SUBJECT VEHICLE 1.  The CI pulled in beside of ROMERO. ROMERO made contact with the CI, eventually making his way to the passenger side door of the CI's vehicle. ROMERO opened the passenger side door and stood partially inside the cab speaking with the CI.

9

**d.** At approximately 4:45 p.m., ROMERO was observed walking back to SUBJECT VEHICLE 1 carrying a white envelope, getting into SUBJECT VEHICLE 1 and driving away.

**e.** MPD Detective Rick Harmon loosely followed ROMERO back to 2685 Helton Gaby RD, Morristown, Tennessee (herein referred to as the SUBJECT PREMISES). Detective Harmon did not see ROMERO arrive, however, ROMERO did not have time to stop anywhere between leaving the meeting and being confirmed to have arrived at this location. Detective Harmon began his surveillance immediately concluding the end of the meeting between the CI and ROMERO.

**f.** At approximately 5:05 p.m., CI returned to a predetermined location to meet with agents/officers to provide a debrief and turn over the purchased documents: (1) U.S. Social Security Card bearing the name: Jose Gonzalez Sanchez, Social Security number XXX-XX-1463 and (1) Tennessee identification card, bearing ID# 106927345 and name: Jose Gonzalez Sanchez.

**g.** CI provided the following information/debrief: I arrived at Wal-Greens, ROMERO was already there and on his phone. ROMERO opened my passenger side door and stood there leaning in. ROMERO handed me two documents, (1) Social Security card and (1) Tennessee ID card wrapped in a tissue. I handed him $175.00 for the documents. I asked ROMERO if he could provide a better price for the documents. ROMERO advised that he could if the CI bought more than one set at a time. We made small talk and we discussed going hunting sometime. I told ROMERO I have a 9mm pistol at home.

10

ROMERO advised he had (3) pistols at home. ROMERO said he had access to guns where he works (now known to be RPN INC). ROMERO said he and his friends have killed several deer and bear. I asked ROMERO where we could go to shoot. CI advised ROMERO explained a range, where the CI believes is near Frank Lorino Park in Morristown. ROMERO advised he lives near Green Park.[2]

9. On November 21, 2016, SSOIG SA Thomas Goldman advised Social Security number (SSN) ending in 1463 is a valid SSN assigned to a living person, not named Jose Gonzalez Sanchez.

10. On December 6, 2016, a recorded call was placed by CI to ROMERO at phone number 423-736-4679. The call was to arrange a purchase three sets of documents from ROMERO.

    **a.** The aforementioned phone conversation between the CI and ROMERO was in Spanish. The CI advised ROMERO had agreed to sell the additional documents for the same price. ROMERO agreed to meet the CI on this date in Morristown at approximately 1630 hours to deliver the said documents.

    **b.** The CI provided ROMERO (3) photos with the following information: Martin Garcia, DOB: 03/05/1991, Hector Alvarado, DOB: 01/01/1984 and Dennis Rivera, DOB: 02/17/1989.

    **c.** Agents arranged to meet with the CI at 1530 hours to place another recorded call to ROMERO prior to the CI picking up the documents.

---

[2] The conversation prompted by the CI regarding firearms was due a social media showing images of ROMERO holding pistols in his hand.

d. At approximately 1530 hours, agents met with the CI and outfitted the CI with audio and visual recording equipment.

e. The CI was provided with $525.00 of buy money that was provided by the U.S. Secret Service SA Thomas Whitehead.

f. At approximately 1600 hours, CI placed a recorded call to ROMERO to establish a meeting location. The conversation was in Spanish. The CI advised ROMERO told him/her to meet at the El Arroyo Mexican Restaurant/Tienda located at 448 S. Cumberland Street, Morristown, Tennessee.

g. Immediately following the call at approximately 1605 hours, the CI left to meet with ROMERO at El Arroyo.

h. At approximately 1614 hours, HSI SA Trevor Christensen and THP SA Tim Southerland observed ROMERO arrive at El Arroyo in SUBJECT VEHICLE 1. Agents observed ROMERO immediately go inside El Arroyo and exit with a bag that he appeared to place in SUBJECT VEHICLE 1.

i. At approximately 1616 hours, HSI/KI SA Trevor Christensen and THP SA Tim Southerland observed the CI arrive and ROMERO get into the vehicle driven by the CI.

j. At approximately 1618 hours, Agents observed ROMERO exit the CI's vehicle and leave.

k. HSI/KI SA Trevor Christensen and THP SA Tim Southerland followed ROMERO to the immediate area around his residence located at Helton Gaby Road. HSI/KI SA Travis Carrier and MPD Detective Rick Harmon picked up surveillance at this point. Agent Carrier and Detective Harmon were positioned

12

a few houses down from the SUBJECT PREMISE and observed ROMERO arrive at 1628 hours and go directly inside. It would be reasonable to state ROMERO took the illegal proceeds from the document transaction into the SUBJECT PREMISES.

l. At approximately 1628 hours the CI returned to the briefing location and turned over (3) Social Security cards and (3) Tennessee identification documents to Morristown Police Department officers. The Social Security cards had the following names and numbers affixed:  Dennis Rivera, XXX-XX-4938, Hector Alvarado,  XXX-XX-7918  and  Martin  Garcia,  XXX-XX-4829.  The identification documents had the following names affixed: Dennis Rivera, Martin Garcia and Hector Alvarado respectively.

m. The CI provided the following statement regarding the meet with ROMERO:  I arrived at El Arroyo and ROMERO got out of his vehicle and got into my vehicle. ROMERO immediately handed me the Social Security cards and Tennessee IDs. I immediately put the documents in my pocket and paid ROMERO $525.00 for the documents. We briefly spoke about hanging out in the future. ROMERO saw a nasal spray in my truck and started asking me if I use cocaine. Also during conversation, ROMERO advised he could provide me better authentic documents for $600.00 a set.

11. On December 8, 2016, SSOIG, SA Thomas Goldman advised Social Security numbers (SSN) ending in:

a. XXX-XX- 4938 to be a valid SSN assigned to a living person, not assigned to Dennis Rivera.

13

    **b.** XXX-XX-7918 is a valid SSN assigned to a deceased person, Gladys N. Lundstrum, DOB 09/18/1901, DOD: 12/20/1995.

    **c.** XXX-XX-4829 is not a valid SSN assigned by the Social Security Administration.

12. On January 12, 2017, agents/officers from HSI, MPD, THP, and USSS met with the CI for the purpose of ordering and additional set of documents (a Social Security card and a Tennessee driver's license) from ROMERO. The following outlines what took place during that controlled event:

    **a.** At approximately 0920 hours, at the direction of agents, CI placed a recorded call to ROMERO at (423) 736-4679 to order a fraudulent Social Security card and a fraudulent driver's license.

    **b.** CI advised ROMERO agreed and told the CI he would meet him/her between 1700 and 1800 hours to deliver the documents.

    **c.** At approximately 1530 hours Customs and Border Protection air surveillance unit was airborne and began conducting surveillance on ROMERO's work place located at 908 Cherokee Drive, Morristown, Tennessee 37814 (RPN INC). Ground surveillance consisting of agents from THP, MPD and HSI were positioned in and around RPN.

    **d.** At approximately 1545 hours, ROMERO was observed leaving his work place driving SUBJECT VEHICLE 1. ROMERO drove next door to a store (Tortilleria Familiar), located at 813 N Cumberland Street, Morristown, Tennessee. ROMERO then pulled around to the back of the said business and remained for a few minutes and prior to returning to the front of the store.

14

ROMERO went inside the business and exited a couple of minutes later and got back into SUBJECT VEHICLE 1.

e. At approximately 1555 hours, CI made a recorded call to ROMERO (423-736-4679). ROMERO told the CI to meet him at the Wal-Mart near Walters State Community College.

f. At approximately 1557 hours, Nissan Xterra, Tennessee Tag # Y39-34U, registered to Melido H JUAREZ, at 1715 Meadowview Lane, Morristown, Tennessee, pulled into the lot in front of ROMERO's vehicle. A then unidentified Hispanic male exited the Nissan and walked back to ROMERO's driver's side window and leaned inside. Approximately two minutes later the then unidentified Hispanic male walked back to the Nissan and he and ROMERO both drove away. CBP air surveillance and ground units followed the Nissan Xterra away from the said business. Surveillance units observed the Nissan pull into Liberty Trailer park inside the Morristown city limits and pulled beside a blue/gray minivan and have a conversation through the window (neither of the drivers exited the vehicles). Approximately one to two minutes later the Nissan drove away. Air and ground units followed the Nissan back to a blue trailer located at 115 Colony Drive, Jefferson City, Tennessee. The then unidentified Hispanic male, was later believed to be Melido Herrera-Juarez, (herein referred to as JUAREZ) a citizen of Guatemala who was arrested on or about February 10, 2017 in Jefferson City by U.S. Immigration Enforcement Removal Officers on Immigration charges as a priority removal stemming from his lengthy criminal history.

15

g.  At approximately 1609 hours, CI departed the briefing location to meet ROMERO. ROMERO called the CI in route and changed the meet location from Wal-Mart to College Square Mall, located at 2550 E. Morris Blvd, Morristown, Tennessee.

h.  At approximately 1614 hours, the surveillance team observed ROMERO in the SUBJECT VEHICLE 1 park in the mall parking lot in front of Dick's sporting goods.

i.  At approximately 1618 hours, the surveillance team observed ROMERO and the CI meeting with one another. ROMERO pulled SUBJECT VEICLE 1 beside CI's vehicle for the exchange. The actual hand-off of the documents in exchange for money was not observed. At approximately 1619 hours, CI and ROMERO drove away. The CI drove directly to the debrief location to turn over the documents to agents.

j.  The CI turned over (1) Social Security card with the name Carlos Reyes and the number XXX-XX-6842 affixed. CI also turned over a Tennessee driver's license bearing the same name and DL number: 243673484. The CI advised he/she paid ROMERO $175.00 for the set.

k.  At approximately 1631 hours the CI provided the following debrief to US Secret Service Agent Thomas Whitehead:  CI stated ROMERO called him/her to change the meeting location to the McDonald's restaurant near the Morristown Mall. ROMERO then changed the meeting location to the mall parking lot in front of Dick's sporting goods. I parked my vehicle and ROMERO pulled up beside my driver's side in a black Ford sedan. ROMERO

16

was the only occupant in the vehicle. I handed ROMERO the money ($175.00) and ROMERO handed me the counterfeit identification documents.

l.  At approximately 1633 hours, surveillance units observed the Nissan, tag number: TN Y39 34U with the unidentified Hispanic male driver arrive and park at 115 Colony Park Dr, Jefferson City, Tennessee (Paradise Point Trailer Park). Detective Rick Harmon, Morristown PD, air surveillance witnessed the vehicle arrive.

m.  JUAREZ, at the time, was believed to be a source of supply/document manufacturer. ROMERO has told CI in past buys he was coming from Jefferson City when delivering documents to the CI. The activities observed by agents on this date lead agents to believe ROMERO met with JUAREZ on this date to obtain the fraudulent documents that then he immediately sold to CI after meeting with JUAREZ.

n.  At approximately 1645 hours, Morristown Detective Jason Young conducted a physical drive by of 115 Colony Park Drive, Jefferson City, Tennessee and took photos of the said Nissan parked at the said residence, gray/blue mobile home.

13. On January 18, 2017, Tennessee Highway Patrol Officer Tim Southerland advised he received the following information: Social Security Office of Inspector General SA Thomas Goldman advised Social Security number (SSN) ending in: XXX-XX- 6842 is a valid SSN, not assigned to Carlos Reyes.

17

14. On February 27, 2017, HSI working with MPD conducted a trash pull on the SUBJECT PREMISES. Agents discovered mail addressed to Eduardo Callejas and Lalo Callejas. Lalo is a known AKA for ROMERO.

15. On March 27, 2017, HSI, USSS, THP and MPD utilized the CI to purchase a Social Security Card ending in XXX-XX-2664 and a fraudulent Tennessee identification document, ID number: 103854210 from ROMERO. Both purchased documents displayed the name: Alexis Rivera Ayala. CI paid ROMERO $600.00 for the said documents. The following outlines what took place during that meeting:

**a**. At approximately 1658 hours, ROMERO arrived at the SUBJECT PREMISES in a 2004 black Jeep Liberty, Tennessee tag: 713XRZ registered to Eduardo C ROMERO (herein referred to as SUBJECT VEHICLE 2). ROMERO entered the residence and stayed only a few minutes. At approximately 1702 hours ROMERO exited the residence and drove away in SUBJECT VEHICLE 2.

**b**. At approximately 1707 hours, the CI arrived at Wal-Greens to meet ROMERO. Agents observed ROMERO continuously from the SUBJECT PREMISES to the Wal-Greens where ROMERO transferred the documents. It is believed the said documents were obtained from within the home and that additional documents and document making equipment is located inside the SUBJECT PREMISES. During a phone conversation between ROMERO and the CI prior to this meeting, ROMERO told the CI where to meet (Wal-Greens). This is when ROMERO returned to the SUBJECT PREMISES, went inside the SUBJECT PREMISES briefly and drove directly to Wal-Greens to meet the CI. Surveillance was continuous and uninterrupted from residence to the meeting location where the document transaction occurred.

18

**c.** At approximately 1710 hours, ROMERO arrived at Wal-Greens, circled the building and then parked beside of the CI. The CI and ROMERO parked by a Redbox display located alongside the exterior wall of Wal-Greens. At approximately1716 hours ROMERO exited the CI's vehicle and got into SUBJECT VEHICLE 2 and drove to a Burger King restaurant in the immediate area.

**d.** At approximately 1724 hours, agents met the CI at a predetermined location to collect the documents purchased from ROMERO and to obtain a statement from the CI. At this time, the CI provided officers with a Social Security card with the last (4) numbers being: 2664 and name: Alexis Rivera, Ayala. The CI also provided a Tennessee ID bearing the same name and ID number: 103854210 and DOB of 02/21/1977.

**e.** At approximately 1742 hours, ROMERO arrived at the SUBJECT PREMISES with an unidentified Hispanic female and went inside. Agents believe ROMERO picked this female up at Burger King.

**f.** At approximately 1745 hours, the CI provided the following statement regarding the document purchase from ROMERO:

**g.** CI advised he/she arrived at Wal-Greens and parked. ROMERO pulled in beside my vehicle, got out and got into my vehicle.

**h.** ROMERO took a white envelope out of his pocket and pulled out from inside a Social Security card and a Tennessee ID. ROMERO then took a photo of the documents with his cell phone.

**i.** ROMERO advised if the documents came back to be associated with a criminal history, he would make me another set for $300.00.

19

**j**. ROMERO told me he had made additional documents that he had to deliver. ROMERO said he had to deliver the said documents to Knoxville, Lenoir City, Sevierville and Johnson City. ROMERO advised he was going to deliver some documents to Johnson City later that night.

**k**. CI advised ROMERO was wearing a blue work shirt, blue pants and was driving a black Jeep Liberty.

**l**. The CI advised he/she pulled out $600.00 and counted it. CI advised that he gave the $600.00 to ROMERO for the documents and ROMERO then counted the money.

16. Further identification of ROMERO was obtained through law enforcement encounters and information discovered through state and federal databases. The following details said encounter and information discovered:

**a**. On March 30, 2017, Morristown Police Detective Rick Harmon advised the suspect then known as Lola BORJA was stopped by Officer Corey Harrison due to the dark tint on the windows of a Jeep Liberty, Tennessee tag number: 713XRZ he was driving. Detective Harmon reported that said traffic stop occurred at approximately 1520 hours at or near the intersection of Shields Ferry Rd and Buffalo Trail. Detective Harmon advised ROMERO provided Officer Harrison with a Mexican Consular card with the following information: Eduardo Romero Callejas, DOB: 12/19/1972. Detective Harmon provided SA Carrier with a copy of said document and a photo of the suspect formally known as BORJA.

**b**. Detective Harmon also advised that ROMERO provided Officer Harrison with a vehicle registration and proof of insurance for the said Jeep listing the owners as Eduardo C. Romero and Rocho Miranda on the registration. The proof of insurance lists the insured as:

20

Eduardo Callejas Romero, 2685 Helton Gaby Rd, Morristown, Tennessee (SUBJECT PREMISES). Officer Harrison issued a verbal warning.

      **c.** Additional investigation revealed ROMERO obtained a Tennessee driver's license on or near 05/11/2001. The said DL number is 098151788. This license information showed a photo of a person previously known as BORJA. The information and or name on the DL lists Eduardo Callejas and DOB: 12/19/1972. The only difference between all of the aforementioned documentation is he (BORJA) dropped Romero from the DL application.

      **d.** BORJA/ROMERO is known to drive the 4-door black Ford, Tennessee Tag number: R7942G (SUBJECT VEHICLE 1) and has used it for criminal activity by delivering fraudulent documents in it. The vehicle is registered to: Eduardo Callejas Romero, 2685 Helton Gaby Rd, Morristown, Tennessee 37814 (SUBJECT PREMISES).

      **e.** Immigration records revealed Eduardo Callejas- Romero, DOB: 12/19/1972, a citizen of Mexico, was encountered at Hereford, AZ on 08/23/2000 where he was found to be in the U.S. without inspection (illegally). ROMERO was allowed to voluntary return to Mexico instead of going before an Immigration Judge and ultimately facing deportation. No Alien File number exists for ROMERO or any further immigration history.

      **f.** ROMERO is employed at RPN INC, 908 Cherokee Drive, Morristown, Tennessee, and to be employed lawfully in the U.S., the employers are required to have employees to complete an I-9 document (proof of US citizenship). In order for ROMERO to be lawfully employed at RPN he had to have filled out the I-9, claimed to be a U.S Citizen, and provided a real Social Security number.

    17.   Based on my experience and training, illegal documents are manufactured on a computer. The manufacturer utilizes items such as printers, scanners, laminating machines,

cutters, card stock, paper stock and computer programs specific for creating documents. This process in my experience generally takes place in the suspect's home or a place rented specifically for manufacturing documents. Surveillance of ROMERO does not provide any cause to believe another dwelling is rented for this process. Most importantly and noted in paragraph 15(b) surveillance observed ROMERO go to the SUBJECT PREMISES and directly to meet the CI to sell a stolen Social Security number belonging to a U.S. Citizen and a Tennessee ID. Document vendors are known to store customer's information such as photos, dates of birth, Social Security numbers, addresses and other items used by document vendors to manufacture and distribute fraudulent government identification documents in ledgers, cell phones, and computers. Based on my training and experience and this investigation, I believe ROMERO maintains such documents at the SUBJECT PREMISES. ROMERO stated he recently made documents he needed to deliver to Knoxville, Sevierville, Lenoir City and Johnson City (See paragraph 15 (j). This shows the criminal activity is ongoing. Specifically with this investigation, ROMERO has used his cell phone (423-736-4679) to receive photos and biographical data for the purpose of manufacturing and distributing fraudulent documents. ROMERO has utilized same cell phone for the purpose of setting up illegal document orders and for arranging meet locations for the purpose of distributing said documents. However, it is believed that ROMERO would also need to use additional equipment to make the documents. Also during this course of investigation, your affiant observed a social media page showing ROMERO holding a pistol. ROMERO is believed to be present in the U.S. without inspection and possessing a firearm under these circumstances is a felony. ROMERO has made statements to the CI in the past he owns several firearms. ROMERO is believed to be present and working in the U.S. unlawfully. In order to be employed, ROMERO would have to be in possession of U.S. citizens identification documents to do so. Your affiant

22

believes those documents are likely being kept at the SUBJECT PREMISES. Your affiant believes that there is probable cause to believe that the aforementioned items and fruits of the crimes will be located within the SUBJECT PREMISES. Lastly, ROMERO has utilized SUBJECT VEHICLE 1 and SUBJECT VEHILE 2 to deliver and distribute the aforementioned fraudulent government identification documents.

## V. CONCLUSION

18. Based on the aforementioned factual information and experience, your affiant respectfully submits that there is probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, U.S.C. Section 1028 are currently located at the SUBJECT PREMISES.

Special Agent Travis Carrier
Department of Homeland Security
Homeland Security Investigations

SUBSCRIBED AND SWORN BEFORE ME
THIS 6 th DAY OF APRIL 2017.

Clifton L. Corker
United States Magistrate Judge

23

# ATTACHMENT A

## DWELLING/PROPERTY/VEHICLES TO BE SEARCHED

**a**. Residence located at 2685 Helton Gaby Rd, Morristown, Tennessee 37814. The residence is a one story ranch style residential dwelling. The exterior is white vinyl and brick yellow in color with a metal roof. The residence has a covered front porch with two doors. The door with the glass storm door appears to be the door most often used to make entrance. On a column in front of said door, metal numbers: 2685 are affixed. A paved driveway is directly in front of said porch.

**b. SUBJECT VEHICLE 1**: 2007 Ford Fusion: VIN: 3FAHP07147R150934, Tennessee tag number: R7942G

**c. SUBJECT VEHICLE 2**: 2004 Jeep Liberty: VIN: 14GL48K64W181170, Tennessee TAG NUMBER: 713XRZ.



24

# ATTACHMENT B

## THE ITEMS TO BE SEIZED

Based on the Affidavit, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 18, U.S.C. 1028A, and Title 42 U.S.C. 408(a)(7)(C)(8), and 18 U.S.C. § 922(g)(5) will be found at the Premises to be searched.

      **a**. Social Security cards and Social Security Card numbers, fraudulent and real numbers that have been stolen belonging to U.S. Citizens. Government identification documents, specifically Tennessee identification documents. The aforementioned documents, based on my training and experience are stored in areas such as: filing cabinets, desk drawers, safes, brief cases, computers and cell phones. Most often Cell phones and computers are tools of the trade. Any place that a reasonable person would believe a document could be stored.

      **b**. Cell phones, official (or fraudulent) seals, stamps, and insignia of the Social Security Department of the United States Government.

      **c**. Applications for government identity documents, handwritten notes and messages relating to Social Security numbers and/or Social Security number holders;

      **d**. Keys and records which tend to indicate ownership or control of the premises, such as rental applications, utility bills, and addressed mail for the **Subject Premises**;

      **e**. Telephone and communication records and correspondence indicating ownership or use of telephone number, including telephone message records, invoices, bills, and logs, telephone and address book, indexes and ledgers;

**f.** Identification documents and identifying information, including names, addresses, dates of birth, Social Security numbers, passwords, address books, Rolodexes and other listings of identification information for any individual.

**g.** Sums of cash consistent with the sale of sets of fraudulent documents that include stolen authentic Social Security numbers.

**h.** Items and devices used in the document manufacturing process such as but not limited to: Computers, printers, scanners, laminators, card stock, various paper products, adhesives, cameras and any like item used in this process.

**i.** Firearms, ammunition, holsters, or other firearm-related items.

As used above, the terms records, documents and materials includes records, documents and materials created, modified or stored in any form.